IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

NORTHERN DIVISION

| | |
|---|---|
| **EILEEN M. BENNETT** <br> 845 Reece Road <br> Severn, Maryland 21144 <br><br> Plaintiff, <br><br> v. <br><br> **SUNRISE SENIOR LIVING MANAGEMENT, INC.** <br> 7902 West Park Drive <br> McLean, Virginia 22102 <br><br> Defendants | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> Case No.: 1:23-cv-00876 <br> * <br> * <br> * <br> * <br> * <br> * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMPLAINT AND JURY DEMAND**

**Count I**

1. This case arises from the Defendant's refusal to grant a reasonable accommodation for a sincere religious objection that the Plaintiff, Eileen M. Bennett, communicated to it regarding the COVID-19 vaccines available in the United States.

2. Ms. Bennett's case is pleaded under (a) Title VII of the federal Civil Rights Act of 1964, 42 U.SC. § 2000e-2(a)(1).

**Parties**

3. Plaintiff Eileen M. Bennett is a resident of the State of Maryland and formerly was employed in her state of residence the Defendant Sunrise Senior Living Management, Inc. ("Sunrise"), a Virginia corporation which regularly conducts business in the State of Maryland.

**Jurisdiction**

4. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1343.

**Prerequisites to Suit**

5. On June 3, 2022, Ms. Bennett filed a charge of religious discrimination against Sunrise with the Equal Employment Opportunity Commission (Charge No. 5331-2021-03131). On December 30, 2022, the EEOC dismissed the charge without a determination of whether or not Sunrise had engaged in discrimination in violation of the statute and notified Ms. Bennett of her right to sue within 90 days of receipt of the notice.

**Facts**

6. In March 2014, Ms. Bennett became employed by Sunrise at its residential facility for senior citizens located in Severna Park, Maryland. Her title was Life Enrichment Manager. She was responsible for creating a daily program of activities for the residents in "Assisted Living," which describes residents having beginning to moderate memory loss. The activities include group exercise, music, games, trivia, baking, arts and crafts, Bible study, and the like. The program is designed for small groups of 3 to 12 residents, depending on the Assisted Living census. Ms. Bennett's role was to invite the members of the group to attend the morning activities. After a break for lunch, she organized activities for the afternoon, following the same routine as in the morning.

7. On January 21, 2021, Ms. Bennett tested positive for COVID-19 at work. She was required to take off work without pay for ten (10) days. She recovered fully. According to scientific studies after the implementation of the COVID-19 vaccines, Ms. Bennett's recovery provided her with a robust natural immunity superior to immunity conferred by such vaccines.

8. Although the COVID-19 virus first appeared in the United States in January 2020, throughout 2020 and into early 2021, Sunrise's employees were not required to be vaccinated. Instead, they used personal protective equipment combined with regular testing to control the spread of the virus, and this worked successfully.

9. However, on March 15, 2021, Sunrise sent a letter to Ms. Bennett announcing that "getting the COVID-19 vaccination will be required as an essential function of the job for all current and new community team members, subject to applicable laws and Sunrise policies." The letter assured employees that COVID-19 vaccines "met FDA's rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support emergency use authorization (EUA)." The letter stated that Sunrise would "address any questions or concerns as well as review individual requests for accommodations." Finally, Sunrise expected all employees to be vaccinated by July 31, 2021.

10. On March 24, 2021, Ms. Bennett called Sunrise and asked for its form to make a request for a religious accommodation. In that call, she said that she did not intend to take the vaccine based on her sincere religious beliefs. She was told by Sunrise that the form would be sent to her.

11. On a monthly basis, Sunrise's agents met with Ms. Bennett. Each time it wanted only to know if she was going to take the vaccine. Each time she refused on the basis of her religious beliefs. And each time, she was informed that if she did not take the vaccine she would be fired.

12. At no time did Sunrise discuss or consider a reasonable accommodation for Ms. Bennett. It did not perform an individualized assessment of the particular facts of her job in order to evaluate whether an accommodation for *her* was a feasible alternative to vaccination. It failed to account for her strong natural immunity and/or that residents with whom she worked were vaccinated already. Most of all, it failed to properly consider whether masking, distancing, and testing were enough to protect the residents (since they had been used and had worked effectively). Those options were practical and easily affordable.

13. In addition, Sunrise knew that the vaccines were only approved under an Emergency Use Authorization. As a result, the vaccines had not been subject to long terms studies to determine their actual safety and effectiveness. These facts should have given Sunrise pause and led it to reconsider a policy that compelled employees to make irrevocable medical decisions or lose their jobs – decisions which affected them outside of the workplace and which they would have to live with even after they left the workplace.

14. On June 10, 2021, Sunrise sent Ms. Bennett a letter denying her a religious accommodation. Oddly, this denial came before Sunrise supplied Ms. Bennett with the appropriate written form for making the request for accommodation. This attests to Sunrise's failure to make an individualized assessment before deciding whether to grant or deny the accommodation.

15. Sunrise's March 15, 2021, letter cited three reasons for the denial: a) that remaining unvaccinated "elevated a direct threat associated with Covid-19 at the community" and (b) reduced the desirability of residents to select Sunrise as their care facility; and (c) that the expense for personal protective equipment and testing would have been "significant."

16. Based upon the June 10, 2021, letter and the fact that Sunrise had made no effort to deal with Ms. Bennett one-on-one, it was not going to make an accommodation for Ms. Bennett. Its position was clear: take the vaccine or be fired.

17. Ms. Bennett eventually succeeded in obtaining from a person in Sunrise's Human Resources division the Employer's Religious Accommodation Request form. She completed and signed the form and hand-delivered it to the same person on July 30, 2021.

18. Ms. Bennett stated on the form that she was a Christian and that she did not make any decisions without prayer. In her own words, she stated that she "did not have peace" about taking the COVID-19 vaccine. She further stated that she was able to perform the duties of her

position without being vaccinated and that she was "requesting any accommodations or adaptations to my position."

19. Sunrise did not show an interest in reconsidering its earlier stated denial. Instead, on August 10, 2021, Vice President Bill McGovern sent Ms. Bennett a letter which stated that her request for a reasonable accommodation was denied again. In a separate letter to Ms. Bennett of the same date, Sunrise gave notice that it placed her on temporary, unpaid administrative leave, effective August 11, 2021.

20. Ms. Bennett was not called back to work and she never worked for Sunrise again. In a word, she was fired for not taking the COVID-19 vaccine.

21. Although Sunrise's March 15, 2021, letter confidently stated that it had carefully reviewed public-health resources to determine whether it should require the COVID-19 vaccine, it is evident that after the letter was written it failed to keep up with the published scientific data and studies which raised serious questions about the alleged safety and effectiveness of the COVID-19 vaccines. Studies showed that the vaccines in fact were not effective in preventing the transmission of the virus, and that a significant number of persons who had taken the vaccines had reported serious adverse consequences, including serious injuries and death. Additionally, several circuit courts of appeal had issued preliminary injunctions against similar federal vaccine mandates in the workplace as to federal contractors and employees, and military personnel, holding that the vaccine mandates were not to be enforced before the employees' claims were considered. Although the walls were crumbling around workplace vaccine mandates throughout the United States, none of this led Sunrise to even pause and reconsider its policy of forcing its own employees to become fully vaccinated.

22. Sunrise's vaccination policy, as applied, was arbitrary and capricious. At the Sunrise's facility in Severna Park, Maryland, there are three residential sections: 1) independent living; 2) assisted living; and 3) reminiscent care, i.e., persons in the late stages of memory loss. The residents of independent living, who are so-called because they are provided no more than house cleaning services, are not required to be vaccinated. Independents reside in an adjoining facility which is connected by a hallway with the building where residents of assisted living and reminiscent care live and engage in daily activities. Independents are allowed to regularly come over to the assisted living and reminiscent care side of the building. They do so daily for exercise classes and special events, which take place in common areas used by residents of assisting living and reminiscent care. Also, independents visit their cohorts in assisting living and reminiscent care in their personal living spaces as well. There is nothing to support the rationality of keeping a vaccine mandate for employees, if the vaccine requirement is not applied to independents.

23. Ms. Bennett searched for other suitable employment, but she was not successful in finding another job until March 27, 2023. She had applied for and obtained that job before becoming aware of Sunrise's March 16, 2023, letter notifying her that it will "retire the COVID-19 vaccination policy and discontinue the requirement to become and fully remain fully vaccinated and boosted against COVID-19 of employment … ." But the letter did not offer Ms. Bennett her job back. It stated that it cannot guarantee that she would be able to return to her former position, but it wanted to obtain additional information to determine "whether Sunrise may be able to place you in a position for which you are qualified if you would like to return to work." She intends to notify Sunrise that she never resigned from her job and that she successfully found another job.

24. Ms. Bennett suffered lost wages of $55,435 from the date of her termination on March 27, 2023, and the amount of front pay lost is to be determined. In addition, she experienced

embarrassment and humiliation from losing her job which she loved.  She was inconvenienced by having to look for another job, and she spent a lot of time doing so – time which she cannot get back.  She worried about whether she would be able to take care of herself without a job, and she suffered anxiety and stress as a result.

**WHEREFORE**, the plaintiff requests:

    a.    An award of compensatory damages for lost wages and non-pecuniary damages in the total amount of $355,435;

    b.    An award reasonable attorney's fees and costs; and

    c.    An award or other relief to which she may be legally entitled.

Respectfully submitted,
**ROBERTS AND WOOD**

 /s/ *Terrell N. Roberts, III*
Terrell N. Roberts, III
Bar ID No. 01091
*Attorney for Plaintiff*
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
(301) 699-8706 Fax
troberts@robertsandwood.com

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

 /s/ *Terrell N. Roberts, III*
Terrell N. Roberts, III